I. FOIA Violation (Summer 2025)

1. The integrity of this case begins with a document that Defendant has attempted to conceal.

2. In 2021, Defendant's Legal Counsel, Susan Williams, transmitted the District's full position statement package to the South Carolina Human Affairs Commission. That package included three critical components:

- A dated transmittal sheet showing the official filing date.
- The mediation/settlement election form completed and returned to SCHAC.
- The position statement itself, bearing a date next to Susan Williams's signature.

Together, these documents established when the District officially filed its response, what process they agreed to (mediation), and authenticated the statement as a contemporaneous filing (see Exhibit A).

3. In 2025, the South Carolina Human Affairs Commission furnished Plaintiff with what it represented as the complete position statement. This version was stripped down and incomplete. It contained only the narrative portion of the position statement, but lacked the dated transmittal sheet, lacked the mediation form, and carried no date alongside the signature. It presented the filing as if it were undated, freestanding, and disconnected from its 2021 context (see Exhibit B).

4. The difference is material. The 2021 package proved the District filed on a specific date with a complete record, while the 2025 version erased that proof and concealed key attachments. By omitting the dated transmittal and other documents, Defendant ensured that Plaintiff never received the full, authentic filing. SCHAC later confirmed the version provided in 2025 was exactly what the District submitted. This was not clerical oversight but a deliberate act that obstructed Plaintiff's access to the complete record, violated FOIA disclosure requirements, and deprived Plaintiff of due process to review and respond to the evidence in its entirety.

5. On August 13, 2025, at 8:00 a.m., Plaintiff contacted Tiffany Richardson, current legal counsel for Richland County School District One, inquiring how to obtain a dated copy of the District's position statement and asking whether a Freedom of Information Act (FOIA) request would be required (see Exhibit C).

6. Plaintiff followed up the next day, August 14, 2025, at 12:02 p.m., to ensure the request had not been overlooked see (Exhibit D).

7. Richardson failed to respond.

8. Defendant's silence was not a mistake; it was a calculated refusal.

9. Defendant's conduct constitutes violations of law, including:

a. FOIA Violation (S.C. Code Ann. § 30-4-30): Plaintiff lawfully requested a public record under South Carolina's Freedom of Information Act, and Defendant's failure to respond within the statutory period was unlawful.

b. Obstruction of Justice (42 U.S.C. § 1983): By providing Plaintiff only a partial excerpt in 2021, allowing SCHAC to circulate an undated version in 2025, and refusing to produce the original dated filing upon direct request, Defendant obstructed Plaintiff's access to critical evidence.

c. Due Process Violation (14th Amendment, U.S. Const.; 42 U.S.C. § 1983): Defendant's concealment deprived Plaintiff of a fair opportunity to review and challenge evidence used against him, striking at the core of procedural due process.

10. Defendant cannot choose which version of the truth to release, nor may it bury records to suit its litigation strategy.

II. Retaliatory Hiring Diversion (Summer 2025)

11. In July 2025, South Carolina enacted legislation permitting non-certified teachers to teach (see Exhibit E). At that time, Plaintiff had just completed the 2024–2025 school year as a full-time English Language Arts teacher with Defendant, receiving salary and benefits. Plaintiff had also served the District as a long-term substitute in 2019–2020 and as a substitute teacher from 2008–2015. Defendant was therefore fully aware of Plaintiff's qualifications and experience.

12. School districts customarily retain teachers they know and trust before hiring new applicants. Despite Plaintiff's proven record in Defendant's schools, Defendant did not respond to Plaintiff's inquiry about the new law in good faith.

13. On July 18, 2025, at 3:23 p.m., Plaintiff first reached out to Patricia Williams, who stated she was not the decision-maker and directed Plaintiff to Devin Washington (see Exhibit F).

14. Plaintiff emailed Washington on July 21, 2025, at 3:39 p.m., and left a voicemail on July 28, 2025, at 10:48 a.m., but Washington failed to provide any response (see Exhibits G-H).

15. Ultimately, Felicia Richardson contacted Plaintiff July 30, 2025 at 10:16am, not to answer the inquiry, but instead to offer non-teaching roles such as instructional assistant or substitute (see Exhibit I).

16. When Plaintiff reiterated his preference to teach under the new law, Richardson stated she had nothing to do with that matter and dismissed the request.

17. On August 11, 2025, Plaintiff sent a follow-up email to Richardson, documenting her diversion of Plaintiff into non-teaching roles and the lack of response from HR (see Exhibit J). Although Plaintiff ultimately accepted a temporary placement at Eau Claire High School as an instructional assistant for special needs students in order to maintain employment, this role did not align with his training, experience, or career path. Plaintiff continued, simultaneously, to apply and interview for full-time teaching positions consistent with his credentials. Later that month, Plaintiff secured a teaching position with Charlotte-Mecklenburg Schools. In that same email, Plaintiff mistakenly referred to "Mr. Williams" instead of Mr. Devin Washington; the reference was a typographical error.

18. Defendant's handling of Plaintiff's inquiry constituted unlawful conduct, including:

a. Retaliation (Title VII, 42 U.S.C. § 2000e-3): By refusing to provide information about the new law and diverting Plaintiff into non-teaching roles, Defendant continued its pattern of retaliation for Plaintiff's prior protected activity.

b. Negligence / Failure to Act (South Carolina common law duty of care): Three Human Resources officials knew of Plaintiff's inquiry, yet none fulfilled their duty to provide a substantive response.

c. Discrimination / Pretext (Title VII, 42 U.S.C. § 2000e-2): Instead of considering Plaintiff for teaching roles consistent with the new law, Defendant relegated him to lesser positions as a pretext to avoid treating him equally.

19. Defendant's deliberate pass-around functioned as a constructive denial of opportunity, designed to sideline Plaintiff rather than honor his right to compete for teaching positions under state law.

III. Harassment Report Ignored (2025)

20. On May 27, 2025, several students informed Plaintiff that their teacher, Ms. Templeton, had told the class in February 2025 that Plaintiff was gay. Students confirmed that the remark was repeated on multiple occasions.

21. On May 28, 2025, Plaintiff immediately reported this misconduct to Principal Chaddrick Myers and Assistant Principal Samuel Murphy (see Exhibit K).

22. On May 30, 2025, after escorting students to their related arts class, Plaintiff returned to his classroom and found Principal Myers inside. Myers was on speakerphone and whispered that he was speaking with Human Resources about the matter. He then quietly left the room.

23. Later that same day, the principal told Plaintiff directly: "You should have written Samuel up. I take allegations and comments like this seriously."

24. Despite this acknowledgment, no further action was taken. The district gave no notice, conducted no investigation, and issued no resolution.

25. This was not a lapse; it was a calculated refusal to act.

26. Defendant's conduct constituted unlawful practices, including:

a. Negligence / Failure to Act (South Carolina common law duty of care): Defendant had a duty to investigate discriminatory remarks made by its employee in a school-sponsored setting. Even after its own principal admitted the seriousness of the allegation, Defendant abdicated that duty.

b. Discrimination / Harassment (Title VII, 42 U.S.C. § 2000e-2): Templeton's comment constituted discriminatory harassment based on Plaintiff's perceived sexual orientation, made publicly before students.

c. Retaliation (Title VII, 42 U.S.C. § 2000e-3): Defendant's silence aligns with its pattern of retaliation against Plaintiff for prior protected activity. By refusing to investigate despite admitting the gravity, Defendant reinforced its willful practice of ignoring Plaintiff's rights.

27. Defendant's silence was not neutrality; it was complicity.


IV. DSS Protocol Inconsistency (October 2024)

28. October 2024, more than a month into Plaintiff's employment, Defendant abruptly required him to complete a Department of Social Services (DSS) (see Exhibit L).

29. On October 31, 2024, at 8:45 p.m., Plaintiff emailed Williams the completed DSS form, apologizing for the delay and explaining that the onboarding portal was missing the rectangular upload box used for all other forms (see Exhibit M). Plaintiff also contemporaneously photographed the form during seventh-grade lunch at 10:58 a.m., while seated at a green cafeteria table before talking to colleagues, underscoring the irregular and disruptive circumstances under which this supposedly "standard" paperwork was demanded (see Exhibit N).

30. Defendant's assurance that DSS paperwork was "standard for all new hires or returning employees" was demonstrably false. Plaintiff's colleague, Ms. Chasity Tolliver, a new hire in the same Project RISE program, confirmed she was never required to complete a DSS form (see Exhibit O). Another colleague, upon seeing Plaintiff's paperwork, remarked: "Fine time for them to be asking about this now."

31. If DSS clearance were truly a universal requirement, it would have appeared in the Plaintiff's initial onboarding materials and been completed before payroll, tax, and medical forms—because such clearance governs a candidate's fundamental eligibility to work with children. Yet the official onboarding instructions issued by the District's Human Resources Office on August 21, 2024, contain no mention of any DSS form or social services clearance requirement (see Exhibit P). Plaintiff completed every step as instructed and was authorized to begin teaching. The District's later claim that DSS paperwork was "missing" is therefore not a reflection of oversight by the Plaintiff but of inconsistent enforcement by the employer. The belated insistence on this form, only after Plaintiff was in the classroom and actively teaching, demonstrates that the requirement was not applied as a bona fide safeguard but invoked selectively—as pretext and retaliation.


32. In its position statement to the South Carolina Human Affairs Commission, the District attempted to mask this inconsistency by appending exhibits purporting to show that DSS clearance was universally required (see Exhibit Q). Rather than curing the contradiction, these materials deepened it. The attached forms originated from Substitute Services protocols—documents that bear no relevance to certified-teacher onboarding under

Project RISE. Their inclusion reflects an after-the-fact attempt to retrofit substitute procedures into a certified-teacher file. The District then dismissed Plaintiff's evidence by claiming he "failed to name the colleague" who was excused from the requirement, speculating that perhaps she had been "separated for over a year." Yet the Plaintiff did identify that colleague, Ms. Tolliver, in his SCHAC intake documentation that the agency failed to disclose in full (see Exhibit R).

33. Defendant's conduct constituted unlawful practices, including:

a. Negligence / Failure to Follow Protocol (South Carolina common law duty of care): Defendant allowed Plaintiff to work for weeks without the alleged "mandatory" DSS clearance, demonstrating disregard for its own safety requirements.

b. Discrimination / Disparate Treatment (Title VII, 42 U.S.C. § 2000e-2): Plaintiff alone was subjected to paperwork that other similarly situated new hires, including those in the same program, were not required to complete.

c. Pretext / Misrepresentation (Title VII, 42 U.S.C. § 2000e-2; § 2000e-3): Defendant invoked "protocol" and brandished exhibits to appear credible, while concealing that those protocols were never uniformly enforced.

d. Obstruction of Justice / Misrepresentation (42 U.S.C. § 1983): By presenting exhibits as proof of universal enforcement while omitting contrary facts, Defendant sought to mislead investigators and distort the record.

34. A policy paraded on paper but abandoned in practice is not compliance; it is duplicity. Defendant's reliance on hollow exhibits does not strengthen its defense. It exposes it.


V. HR Gatekeeping & Records (Aug 2024)

35. In both 2022 and 2023, the District repeatedly reached out to him through its own recruiting system, inviting him to apply for Project RISE (see Exhibit S).

36. Plaintiff did not solicit these invitations; the District contacted him directly.

37. That outreach confirms that even after the 2021- 2022 conflict, the District considered him eligible.

38. Only in 2024, once the District realized who he was, did the process shift to barriers, stalls, and deliberate obstruction.

Tammy Small's Instructions (July 25, 2024)

39. At the direction of Columbia High School's principal, Plaintiff met with Tammy Small at the District office to resolve application issues.

40. Instead of following protocol, Small instructed Plaintiff to select "No" under certification in the Frontline portal rather than "Yes, certification anticipated."

41. She further directed Plaintiff not to upload his Teachers of Tomorrow documents into the system, but to email them directly to her (see Exhibit T).

42. Plaintiff complied, sending the only two documents that exist prior to Praxis: a July 2021 admission letter and an October 2021 course-completion letter (see Exhibit U).

43. By July 29, Plaintiff's résumé appeared in Frontline, but his certification materials were invisible to principals because Small had diverted them to her inbox.

44. This concealment explains why a Principal later opened his file, saw nothing, and asked Plaintiff to resend his Teachers of Tomorrow documentation. In fact, Principal Patrice Green of Hand Middle School on August 1, 2024 at 4:25pm specifically asked if Plaintiff had a PACE letter or eligibility letter, and when Plaintiff clarified he was enrolled in Teachers of Tomorrow, Green admitted: "Okay, because I didn't see that in the system" (see Exhibit V).

The "Updated Letter" Barrier (August 6, 2024)

45. Without warning, Small shifted the requirement, demanding an "updated preliminary qualification letter" (see Exhibit W).

46. Plaintiff immediately explained that no such document exists. Teachers of Tomorrow confirmed in writing that they issue only three documents:

- an admission letter
- a completion letter
- a final Letter of Eligibility once Praxis is passed

47. Nevertheless, Small persisted, creating a barrier Plaintiff could never satisfy.

The Manufactured Barrier

48. This tactic guaranteed that Plaintiff appeared "non-compliant" on paper.

49. Principals looking in Frontline saw an empty portal, unaware that HR already had Plaintiff's documents but withheld them while insisting on an impossible requirement.

50. In effect, HR blocked Plaintiff from being cleared while schools were actively trying to hire him.

Principals' Confusion and Mixed Signals

51. The obstruction created whiplash at the school level:

- Columbia High first told Plaintiff to apply "as soon as possible," then abruptly declared all vacancies closed.
- Crayton's principal called Plaintiff "the hottest thing on the market," only to retract the invitation minutes later.
- At St. Andrews, administrators applauded his results and said "welcome home," yet no offer followed.

52. These reversals were not random; they were the mixed signals produced by HR's interference.

Tampering with Application Records

53. The obstruction is further evidenced by the disappearance of Plaintiff's live job submissions in AppliTrack, including:

- Columbia High School (Job ID 10333)
- Hand Middle School (Job ID 10390)

54. Both vanished from Plaintiff's application history. Plaintiff discovered their removal at approximately 10:48 p.m. on August 15, 2024; they were schools that had interviewed Plaintiff and expressed interest in hiring him (see Exhibit X)

55. By contrast, Southeast Middle School remained because it was later spun as the "placement" HR gave him, and St. Andrews remained because Plaintiff never applied there (the school reached out directly).

56. Even schools where Plaintiff applied but never heard back remained visible.

57. Only the schools that wanted him, and had advanced him, disappeared.

58. This selective erasure is consistent with HR's other tactics: conceal documents, demand impossible paperwork, and erase records of schools that showed interest.

Ignored Allegations of Obstruction

59. In Plaintiff's original charge to the South Carolina Human Affairs Commission, he explicitly alleged that HR delayed and obstructed the process by demanding unnecessary paperwork and giving contradictory instructions (see Exhibit Y).

60. The District's position statement never addressed these allegations. Instead, it narrowly focused on the DSS form requirement and sidestepped obstruction entirely (see Exhibit Z).

61. This omission is telling: a party that can defend itself will do so; a party that remains silent does so because the truth cannot be denied.

62. Defendant's conduct constituted unlawful practices, including:

a. Retaliation (Title VII, 42 U.S.C. § 2000e-3): HR singled Plaintiff out for impossible requirements in response to his protected activity, while erasing applications that proved his candidacy was strong.

b. Obstruction of Justice (42 U.S.C. § 1983): By diverting documents to private email, demanding non-existent paperwork, and tampering with application records, HR obstructed Plaintiff's ability to compete fairly.

c. Discrimination / Pretext (Title VII, 42 U.S.C. § 2000e-2): Principals expressed interest and advanced Plaintiff, but HR imposed barriers not applied to other candidates, revealing a pretext for unequal treatment.

d. Due Process Violation (14th Amendment, U.S. Const.; 42 U.S.C. § 1983): The selective disappearance of applications and withholding of documents deprived Plaintiff of the transparency and fairness guaranteed in the hiring process.

63. A District cannot court a candidate one year and erase him the next without revealing its hand. Recruitment proves eligibility. Erasure proves retaliation.


VI. Only Southeast Falsehood (Summer 2024)

64. Defendant's position statement falsely asserts that Southeast Middle School was the only school that sought to recommend Plaintiff. The record shows otherwise.

65. On July 23, 2024, Columbia High School Principal Shawn Washington explicitly told Plaintiff she would recommend him. She confirmed this in writing, instructing him to "update and create your profile and complete the application as soon as possible," copying her secretary, Lucretia Triplett. Washington proceeded with reference checks, confirming her recommendation was deliberate. (see Exhibit AA)

66. Between July 18 and August 1, 2024, Hand Middle School administrators Green and Assistant Principal Devin Robinson personally reached out, scheduled interviews, and escalated efforts to secure Plaintiff. Robinson shared his personal cell number and directed Plaintiff to call (See Exhibit BB). Green confirmed positive references, pressed Plaintiff to confirm whether other schools were pursuing him, and stated she "really needed" his documents sent immediately. Green further indicated she was determined to "get you in here creatively as possible," even exploring positions outside of ELA to retain him. (See Exhibit V).

67. On August 7, 2024 at 5:01pm, St. Andrew's Middle School Assistant Principals Jermie Brown and Chasity Hanton expressed enthusiasm about Plaintiff's candidacy, applauded his EOC results, acknowledged his leadership, and recognized his cultural contributions: "We're about to have a step team here. You know we're going to put you to work, right?" They concluded with, "Welcome home," confirming their intent to bring Plaintiff into their building. (See Exhibit CC).

68. These statements and communications confirm that at least three separate schools expressed urgency, persistence, and enthusiasm in pursuing Plaintiff's candidacy.

69. Defendant's assertion that only Southeast Middle School expressed interest is not merely inaccurate; it is contradicted by contemporaneous emails, and statements from its own administrators. This is not oversight. It is willful erasure.

70. Defendant's conduct constituted unlawful practices, including:

a. Retaliation (Title VII, 42 U.S.C. § 2000e-3): By erasing evidence of multiple recommendations, Defendant concealed favorable treatment that contradicted its narrative and retaliated against Plaintiff for prior protected activity.

b. Discrimination / Pretext (Title VII, 42 U.S.C. § 2000e-2): Despite multiple schools expressing interest, Defendant imposed barriers and later claimed only Southeast was supportive. The inconsistency reveals pretext and unequal treatment.

c. Obstruction of Justice / Misrepresentation (42 U.S.C. § 1983): By submitting a position statement omitting known facts and quotes from multiple principals, Defendant misled SCHAC and attempted to distort the record.

d. Due Process Violation (14th Amendment, U.S. Const.; 42 U.S.C. § 1983): Plaintiff was entitled to a fair and accurate review of his candidacy. The selective erasure of recommendations deprived him of transparency and undermined the integrity of proceedings.

71. A District cannot erase its own principals' words. Three schools said "we want him." HR said "no one did." That is not a mistake. That is misrepresentation, weaponized as policy.

VII. Principal Reversals & Pretext (Summer 2024)

72. The record shows that multiple principals advanced Plaintiff through the hiring process, expressed urgency, and in some cases initiated reference checks. Yet those same principals abruptly reversed course, providing explanations that collapse under scrutiny. These reversals expose Defendant's use of pretext to deny Plaintiff employment opportunities he had earned.

Columbia High School – Job ID 10333

73. On July 23, 2024, Plaintiff interviewed with Washington. At the close of the interview, Washington explicitly stated she would recommend Plaintiff for hire, clarifying that the District itself issued formal contracts.

74. On July 25, 2024, Plaintiff followed up by email. Washington replied: "be sure to update and create your profile and complete the application as soon as possible," copying her secretary, Triplett. This was not casual encouragement; it was a concrete step toward hire.

75. On July 31, 2024, Washington abruptly reversed course, emailing Plaintiff: "all vacancies have been filled and I wish you the best in your future endeavors" (see exhibit DD).

76. That statement was false. Job ID 10461, another Columbia High English vacancy, remained posted well into August. Plaintiff documented its availability on August 15, and 21 (see Exhibit EE).

77. The reversal is further exposed by Triplett's August 29, 2024 call inviting Danielle Richardson to interview for the very same English vacancy under Job ID 10333. Richardson's application, submitted after Plaintiff's, lacked a résumé, transcript, or certification, making her a demonstrably less qualified comparator (see Exhibit FF).

Hand Middle School – Job ID 10390

78. On July 31, 2024 at 10:00am, Plaintiff interviewed with Robinson. Immediately after, Robinson instructed Plaintiff to complete his Project RISE application and call him once submitted.

79. On August 1, 2024, at 1:11 p.m., Robinson emailed Plaintiff his personal cell phone number and stated that if another candidate failed to commit by 5:00 p.m., "the job would

go to you." He added: "More than likely, knowing him, he's not gonna fall through" (see Exhibit GG).

80. By 4:25 p.m. that same day, Robinson retracted, saying the school moved forward with another candidate. Yet Green pressed further, insisting Hand would "get you in here creatively as possible," even exploring CTE roles (Exhibit V).

81. Green confirmed Plaintiff's references were positive, Robinson told Plaintiff "I'm rooting for you," and Hand administrators pressed him to submit documents immediately. Despite this, Job ID 10390 disappeared from Plaintiff's application history just as Columbia High's posting had (see Exhibit V).

Crayton Middle School

82. On August 7, 2024 at 11:32am, Principal Angela Burns called Plaintiff, stating: "You are the hottest thing on the market right now. I want you to come look at my school before you say yes to anyone else" (see Exhibit HH).  At 12:51am, Burns called back, retracting the invitation with the explanation the position was "no longer available, someone else has gotten it, there was a mix up" (see Exhibit II)

83. Such an immediate reversal strongly supports the inference of HR interference, collapsing genuine interest into sudden rejection.

St. Andrew's Middle School – Job ID 10183

84. On August 7, 2024 at 5:01pm, Plaintiff interviewed before Brown and Hanton. Both praised his EOC results and concluded with "Welcome home" and "Come on home," confirming intent to hire (Exhibit CC).

85. On August 16, 2024, Plaintiff sent a follow up email regarding his recent interview (see Exhibit JJ). On August 18, 2024, Principal Jemetta Hodges-Stewart emailed Plaintiff: "Unfortunately we chose another candidate. I wish you luck on your future endeavors" (see exhibit KK).

86. This was false. Job ID 10183 remained posted as of August 19 and August 22 (see Exhibit LL), and the person ultimately hired did not begin until late September or early October 2024.

87. Hodges-Stewart, who was privy to prior unsubstantiated allegations in Plaintiff's file, did not personally interview him and later declared the position filled weeks before it actually was.

Keenan High School – Job ID 10580

88. On July 29, 2024, at 4:04 p.m., Plaintiff submitted his application for Keenan's English vacancy under Job ID 10580. His file was complete: résumé, transcript reflecting his cum laude distinction, enrollment in Teachers of Tomorrow, and supporting documentation (see Exhibit MM).

89. On August 11, 2024, at 4:47 p.m., Danielle Richardson submitted her application for the same position. Her file lacked a résumé, transcript, and certification (see Exhibit NN).

90. Despite these deficiencies, Richardson received an invitation to interview on August 16, 2024, from Sharett Erving, the principal's secretary, at 12:46 p.m. (see Exhibit OO). On August 19, at 9:46 a.m., she was sent a date and time (see Exhibit PP), and at 10:03 a.m., Principal Jabar Hanken personally called her to introduce himself and request credentials—credentials that should already have been in the application file (see Exhibit QQ). At 2:11 p.m. the same day, Richardson declined, stating she had accepted another position.

91. On August 20, 2024, at 2:55 p.m., Plaintiff emailed Hanken directly, referencing his prior application under Job ID 10580 and expressly requesting consideration if the position remained available. He received no reply, no call, no interview, no acknowledgment (see Exhibit RR).

92. The contrast is stark. Plaintiff applied first, with a credentialed and complete file. Richardson applied later, with a deficient file, and was courted with an invitation, a confirmation, and a personal call from the principal himself. Richardson walked away. Plaintiff was shut out. This was not oversight. This was deliberate exclusion.

93. A principal who writes 'complete your profile,' who gives a candidate a personal number, who calls him 'the hottest thing on the market,' or who closes with 'welcome home' is not merely interested, they are moving to hire. To then reverse course while postings remained open, and while less qualified candidates advanced, is not routine discretion. It is pretext. And pretext is the fingerprint of unlawful motive.

94. Defendant's conduct constitutes violations of law, including:

a. Discrimination / Disparate Treatment (Title VII, 42 U.S.C. § 2000e-2): Advancing less qualified comparators (e.g., Richardson) while excluding Plaintiff despite superior credentials and earlier applications.

b. Pretext (Title VII, 42 U.S.C. § 2000e-2): Offering contradictory or false explanations ("all vacancies filled" while postings remained active) to disguise unlawful motive.

c. Retaliation (Title VII, 42 U.S.C. § 2000e-3): Sudden reversals after Plaintiff's protected activity and history with HR, revealing causal linkage.

d. Denial of Equal Opportunity (42 U.S.C. § 1983; 14th Amendment): Manipulating postings and application histories to erase or bypass Plaintiff's candidacy.

e. Bad Faith Interference / Obstruction (42 U.S.C. § 1983): HR's orchestration of principal reversals despite principals' initial intent to hire.

95. Principals moved to hire. HR pulled the plug. Less qualified candidates advanced while Plaintiff was erased. That is not discretion; that is discrimination disguised as pretext.

VIII. The Origin of the Poison File (2021–2022)

96. The reversals of 2024 were not born in a vacuum. They were the fruit of a poisoned tree planted in 2021, when the District first manufactured a false record of misconduct and placed it in Plaintiff's file. From that day forward, every barrier, every stalled application, and every pretext can be traced back to the same source: a fabricated narrative that Defendant knew was false, but weaponized to end Plaintiff's career.

IX. Fabricated Narrative & Overreach (May–June 2021)

97. On May 28, 2021, a mother phoned Principal Craig Washington and stated Plaintiff was not to pick up her son, that he was off the team. She alleged Plaintiff called her son after hours, picked him up without permission, brought him home late on school nights, and took him to his private studio. She further claimed she had seen text messages she considered sexual in nature, including one where Plaintiff allegedly apologized for the student seeing a sexual toy (a dildo) in his trunk. Washington's own memorandum concedes the parent "did not want to share additional information currently." Only after what he labeled "probing questions" did she provide statements. This was not a spontaneous complaint but a narrative coaxed into existence by persistence, later ratified as fact.

98. That same afternoon, following his regular coaching routine, Plaintiff went to the student's home. Unaware that the mother had earlier phoned Principal Washington, Plaintiff was told, "He's on punishment." Plaintiff complied and left, consistent with prior temporary punishments.

99. On June 1, 2021, Plaintiff resumed his ordinary duties of picking up the student for step team practice. While on campus, he encountered a former classmate who was a coach and casually asked about the summer football schedule, since it could affect step practice times. The coach did not know the details and referred Plaintiff to the athletic director.

100. The athletic director alerted Washington that Plaintiff was on campus and walked him toward the principal. They met in the hallway, not in a formal meeting. Washington asked why Plaintiff was on campus and whether the student's mother had spoken to him. Plaintiff replied no. Washington then stated: "Mom said not to pick him up. He's off the team. He's not going to Florida." Plaintiff acknowledged the message, thanked Washington, and left.

101. The June 1 hallway exchange was the only escort that occurred. It was informational, not disciplinary.

102. The following day, on June 2, 2021, Principal Washington left Plaintiff a voicemail instructing him to return to the school. This direct invitation undercuts any later assertion that Plaintiff was trespassing, loitering in the weight room, or returning against instructions.

103. On August 23, 2021, Washington authored a narrative that does not match reality, claiming Plaintiff was "caught in the weight room," kept returning after being told not to, begged for access, and asked to "sub at the school" (see Exhibit SS).

104. The June 1, 2021, audio recording contradicts Washington's account. Plaintiff states calmly: "Mom blocked me. She doesn't communicate with me. Dad is the one who handles the business." Washington himself read the father's supportive texts aloud, yet later wrote that Plaintiff was aware the mother had cut off communication. Washington further claimed Plaintiff was merely "confused" as to why the student, described as the "best stepper," was removed from the team (see Exhibit TT).

105. Washington inverted facts: he converted a single informational escort into a disciplinary scene; recast an invited conversation as trespass; and inserted stigmatizing details months later to justify action already taken.

106. Washington also exceeded his authority. Plaintiff's step team, known as Brothers and Sisters of Distinction ("BSOD"), was an independent community program enrolling students from multiple districts. Yet Washington interrogated and attempted to police this private program. He went further, asserting that a parent identified Plaintiff as "the coach of the step team at St. Andrews Middle and Columbia High." That assertion was false. BSOD was never a District team. It was a community organization, and a fact reflected in contemporaneous parent emails and social media posts (see Exhibits UU). By rebranding BSOD as District property, Washington manufactured jurisdiction where none existed and

circulated this misrepresentation to other administrators, thereby creating the false appearance that Plaintiff acted in an official District capacity when he was not.

107. Defendant's conduct constitutes violations of law, including:

a. Jurisdictional Overreach (South Carolina common law; 42 U.S.C. § 1983): Washington attempted to assert District control over Plaintiff's independent community program, which the District had no authority to police.

b. Fabrication of Evidence / Post-Hoc Rationalization (42 U.S.C. § 1983; 14th Amendment Due Process): Washington inserted new, false details in August 2021 that directly contradicted the June 1 audio.

c. Defamation & Stigmatization (South Carolina common law; 42 U.S.C. § 1983): The fabricated details (weight room ambush, begging, subbing request) cast Plaintiff in a false and damaging light, injuring his reputation and employment prospects.

d. Abuse of Office / Misuse of Records (42 U.S.C. § 1983): Washington converted known-false assertions into an official District record to justify adverse action.

108. Dates do not bend to fiction. Cleared in writing on May 28. Invited to campus on June 2. New accusations first appear on August 23. The August memo is a post-hoc cover devised to sanitize the early-June deactivation and manufacture authority the District never possessed. The paper trail defeats the story.


X. Adverse Action Without Process (June 2, 2021)

109. On May 28, 2021, at 1:18 p.m., Chief Human Resources Officer Dr. Jeffrey Long asked Substitute Coordinator Alfreda Boyd: "Do we have a George Moses as a substitute? (see Exhibit VV).

110. At 2:14 p.m., Boyd replied: "Yes, he is a substitute." (see Exhibit VV). She omitted the critical fact that Plaintiff had not worked in Richland One since March 2020, over a year earlier. This omission created the false appearance that Plaintiff was still active under District supervision and subject to school-level "investigation."

111. At 3:06 p.m., Boyd pressed Washington directly: "Have you conducted an investigation in this matter?" (see Exhibit WW).  This question forced a formal response on the record.

112. At 3:44 p.m., Washington answered Boyd: "I spoke with the student with my guidance counselor present. The student did not share any information we could report to law

enforcement or DSS. I will follow up with the mother." In short, he found no reportable misconduct. (see Exhibit XX).

113. At 3:51 p.m., Boyd replied: "The investigation is completed by the school, and if needed the attached substitute evaluation is completed with your findings and submitted to Substitute Services. We do not talk directly to parents or students." This directive effectively pushed Washington to generate paperwork against Plaintiff despite no criminal conduct being found (see Exhibit YY).

114. At 4:26 p.m., Washington forwarded Boyd's directive and the evaluation form up to Dr. Long with a one-line note: "FYI" (See exhibit ZZ). This placed HR leadership on direct notice that:

- No criminal conduct was found.
- Boyd was nevertheless steering Washington to create a paper trail.

115. On June 2, 2021, the last week of school, Plaintiff was quietly removed from the substitute system without notice, charges, or an opportunity to respond (see Exhibit AAA). When Plaintiff contacted Boyd, she confirmed: "Dr. Long told me to take you out."

116. When Plaintiff then reached Dr. Long directly, Long admitted: "Yes, because you are under investigation," but refused to identify any charges or provide process.

117. The positions are irreconcilable. The District cannot both close with "no criminal conduct" on May 28 (see Exhibit XX) and simultaneously declare an "ongoing investigation" on June 2 (see Exhibit BBB). This sequence reveals not process, but pretext: Washington manufactured a record, Boyd operationalized the removal, and Long authorized it.

118. Defendant's conduct constitutes violations of law, including:

a. Adverse Action (Title VII, 42 U.S.C. § 2000e-3; 42 U.S.C. § 1983): Plaintiff was removed from the substitute system without cause, charges, or process, constituting an adverse employment action.

b. Procedural Due Process Violation (14th Amendment, U.S. Const.; 42 U.S.C. § 1983): Plaintiff was deprived of notice, charges, and a hearing before removal, striking at the core of due process protections.

c. Pretext (Title VII, 42 U.S.C. § 2000e-2): The District offered contradictory explanations, including omission of Plaintiff's inactive status since March 2020, revealing that the stated reasons were a false cover for unlawful motive.

d. Retaliation (Title VII, 42 U.S.C. § 2000e-3): The removal was motivated by Plaintiff's protected activity and history of pressing for accountability, evidencing retaliatory intent.

119. You cannot clear in May, erase in June, and call it "process." That is not procedure; that is punishment.


XI. Post-Hoc Retaliation / Retaliatory Paper Trail (July–Aug 2021)

120. On June 2, 2021, Plaintiff discovered he had been removed from the District's substitute system. Alfreda Boyd confirmed: "Dr. Long told me to take you out." From that moment, District officials knew Plaintiff was aware of the adverse action.

121. In the weeks that followed, Plaintiff began pressing for answers. He visited the District office repeatedly, sent emails, and ultimately delivered a notarized letter on July 20, 2021, to Dr. Jeffrey Long, with copies to the Superintendent and the Board of Commissioners (see Exhibit DDD). The letter demanded disclosure of:

- What the parent had reported
- What Principal Washington had documented
- What process was followed
- What findings had been reached
- Plaintiff's current status with the District

122. No official ever responded.

123. In early August 2021, internal emails show Long pressing Washington for "findings" or a "conclusion" to put in writing. This pressure came only after Plaintiff's removal was challenged and his July petition placed District leadership on formal notice.

124. On August 23, 2021 nearly three months after the May events, weeks after Plaintiff uncovered his removal, and one month after his notarized demand, Washington produced a new "findings" memorandum. For the first time, it alleged that:

- Plaintiff was "caught in the weight room looking for the student."
- Plaintiff "kept returning after being told not to."
- Plaintiff "begged for access."
- Plaintiff asked if he could "sub at the school."
- Plaintiff "claimed" he communicated with the student's father via text.

In that same memorandum, Washington wrote he "reminded Mr. Moses he had not subbed at Columbia High in over two years." Washington was new to the District and could not have known this fact absent HR's involvement. This line is a tacit admission that Plaintiff was not an active employee at Columbia High, undercutting the claim that he was "begging to sub" for access to the student.

125. These allegations did not exist contemporaneously. They were absent from the May 28 and June 1 communications, and emerged only after Plaintiff began challenging HR and Board leadership about his removal.

126. The June 1 audio recording squarely contradicts the August memorandum. On the tape, Plaintiff calmly states: "Mom blocked me. She doesn't communicate with me. Dad is the one who handles the business." Washington himself reads aloud the father's supportive text messages (see Exhibit FFF) The recording proves:

- No "weight room" ambush occurred,
- No begging took place,
- No request to "sub" was made, and
- Communication with the father was not a "claim," but confirmed by Washington in real time.

127. Washington's August memo inverted facts already established on the record. It recast a single informational escort as trespass, erased the father's acknowledged involvement, and inserted stigmatizing details only after Plaintiff's protected petitioning activity.

128. The timing and content reveal deliberate fabrication. Washington's August memo was not clarification; it was retaliation, a post-hoc attempt to justify an adverse action already executed on June 2, only after Plaintiff exposed the removal and demanded accountability.

129. Defendant's conduct constitutes violations of law, including:

a. Fabrication of Evidence (42 U.S.C. § 1983): Washington created a post-hoc memorandum that inserted false allegations contradicted by contemporaneous communications and audio, manufacturing evidence to justify an earlier adverse action.

b. Obstruction of Justice (42 U.S.C. § 1983): By generating a retroactive record only after Plaintiff challenged his removal, Defendant obstructed Plaintiff's ability to access accurate, contemporaneous evidence.

c. Retaliation (Title VII, 42 U.S.C. § 2000e-3): The August memorandum was escalatory retaliation, issued in response to Plaintiff's protected petitioning activity, including his July 20, 2021 notarized demand letter.

d. Due Process Violation (14th Amendment, U.S. Const.; 42 U.S.C. § 1983): Defendant replaced contemporaneous process with a fabricated after-the-fact justification, depriving Plaintiff of timely notice and an opportunity to respond.

130. The District's own timeline collapses under basic logic: it claims Plaintiff was removed June 1, 2021; reactivated October 1, 2021; and yet "resigned" July 23, 2021while

simultaneously asserting an "ongoing investigation." One cannot be cleared in May, suspended in June, resigned in July, reactivated in October, and still under investigation in August. These are not explanations; they are excuses in conflict

XII. Silent Reactivation (Oct 2021)

131. After the July 20 notarized demand, the District remained silent: no explanation from HR, the Superintendent, or any Board member.

132. On October 7, 2021, the District quietly reactivated Plaintiff in the substitute system without letter, apology, or correction (see Exhibit BBB).

133. The reactivation undercuts the District's later 2025 claim in their position statement that Plaintiff "resigned" on July 23, 2021; a person who "resigned" does not require reactivation on October 7.

134. Defendant's conduct constitutes violations of law, including:

a. Obstruction of Justice (42 U.S.C. § 1983): By refusing to create an accountability record and silently reactivating Plaintiff without explanation, Defendant obstructed transparency in proceedings.

b. Negligence / Failure to Act (South Carolina common law duty of care): Defendant ignored a formal due-process demand, abdicating its responsibility to provide notice, explanation, or correction.

c. Pretext (Title VII, 42 U.S.C. § 2000e-2): The October reactivation contradicts Defendant's later "resignation" narrative, exposing the inconsistency as a pretextual defense.

d. Retaliation (Title VII, 42 U.S.C. § 2000e-3): The District's silence and reactive correction occurred only under pressure, consistent with retaliatory motive rather than lawful process.

135. A true resignation leaves nothing to revive; the very act of reactivation exposes Defendant's account as false and untenable.

## XIII. Deceptive Mediation & Redactions (2021–2022)

136. In SCHAC mediation (2021), District counsel repeatedly reduced the matter to "parental preference," despite Plaintiff's direct request to know what had been said about his name. Counsel deliberately withheld the salacious allegations the District had already circulated internally (e.g., "dildo," "sexual texts," "late-night studio"), leaving Plaintiff misled and deprived of meaningful participation.

137. By concealing the actual allegations, the District denied Plaintiff any chance to confront or rebut them.

138. On November 29, 2021, Plaintiff submitted a FOIA request. The District produced documents with critical passages redacted, not merely student identifiers but the core allegations about Plaintiff himself (see Exhibit GGG).

139. These redactions did not protect a child; they protected a narrative. Transparency was replaced with deletion.

140. Defendant's conduct constitutes violations of law, including:

a. Due Process Violation (14th Amendment, U.S. Const. § 1983): By concealing the actual allegations during mediation and framing the issue as mere "parental preference," Defendant deprived Plaintiff of a meaningful opportunity to confront and rebut evidence used against him.

b. FOIA Violation (South Carolina Code Ann. § 30-4-30): By redacting not just student identifiers but the core allegations against Plaintiff, Defendant unlawfully withheld public records and denied access to material facts.

c. Obstruction of Justice / Constructive Deception (42 U.S.C. § 1983): By misrepresenting the record through omission and allowing mediation to proceed on incomplete information, Defendant obstructed Plaintiff's ability to defend himself.

d. Defamation / Stigmatization (South Carolina common law): By maintaining salacious allegations in internal files while denying Plaintiff access to rebut them, Defendant cast Plaintiff in a false and damaging light.

141. When the truth would collapse the story, the District didn't defend it. They blacked it out.


## XIV. Demand for Answers Ignored (July 2021)

142. By mid-July, Plaintiff had been removed without notice, labeled "under investigation" without charges, and left in limbo.

143. On July 20, 2021, Plaintiff sent a detailed, notarized demand to HR, with copies to the Superintendent and the Board.

144. No response issued; no charges, no findings, no process.

145. The silence was not neutral; it was strategic. By refusing to answer, the District avoided creating any record it would later have to reconcile with the facts.

146. Defendant's conduct constitutes violations of law, including:

a. Due Process Violation (14th Amendment, U.S. Const. § 1983): By refusing to provide notice of charges or findings, Defendant deprived Plaintiff of the procedural safeguards required before adverse action.

b. Obstruction of Justice (42 U.S.C. § 1983): By stonewalling a notarized demand and declining to create an official record, Defendant obstructed Plaintiff's ability to obtain transparency and pursue remedies.

c. Retaliation (Title VII, 42 U.S.C. § 2000e-3): Defendant's strategic silence after Plaintiff's protected petitioning activity constituted retaliation, punishing Plaintiff for seeking accountability.


XV. Post-Mediation Humiliation & Evasion (April 2022)

147. On April 4, 2022, Plaintiff emailed District counsel Susan Williams requesting clarity regarding the policies and infractions allegedly broken and his current employment standing (see Exhibit HHH).

148. Rather than respond substantively, counsel copied senior administrators including Craig Washington and characterized Plaintiff's language in prior mediation as "inappropriate," a statement designed to humiliate and discredit Plaintiff in front of colleagues (III).

149. Counsel's response deflected the substance of Plaintiff's request, refused to provide clarity, and directed him elsewhere, continuing the same concealment tactics employed during mediation.

150. Plaintiff replied calmly and professionally, underscoring that the requested information had never been provided prior to mediation  (see Exhibit JJJ).

151. Defendant's conduct constitutes violations of law, including:

a. Due Process Violation (§ 1983): By refusing to clarify the grounds for adverse action and instead stigmatizing Plaintiff, Defendant denied him a meaningful opportunity to confront allegations.

b. Retaliation (Title VII): Plaintiff's request for transparency was protected activity. The retaliatory response, marked by shifting blame, public humiliation, and evasion, was intended to chill further protected activity.

c. Defamation and Stigmatization: By framing Plaintiff as "inappropriate" in communications circulated to administrators, Defendant cast him in a false and damaging light.

152. When answers were owed, the District chose humiliation. What should have been transparency became performance; not for truth, but for spectacle.


XVI. Unprofessionalism' functioned as a conviction, placed in the subject line (May 28, 2021)

153. On May 28, 2021, Washington emailed HR with the subject line: "Parent called regarding unprofessionalism from Moses, the substitute." (see Exhibit ZZ).

154. The subject line was false and prejudicial: Plaintiff was not acting as a District substitute; he was coaching an independent program.

155. "Unprofessionalism" is not a fact; it is a verdict, broadcast to HR before any review, and it became the pretextual tag HR relied on to justify removal.

156. The District never notified Plaintiff of this accusation, never allowed a response, and never corrected the record, even after later contradictions surfaced.

157. Defendant's conduct constitutes violations of law, including:

a. Jurisdictional Overreach (42 U.S.C. § 1983): Defendant improperly extended District authority into Plaintiff's private LLC coaching activities, which fell outside its lawful scope.

b. Defamation / Stigmatization (South Carolina common law; 42 U.S.C. § 1983 when used in official records): By labeling Plaintiff "unprofessional" in an official HR communication, Defendant created a stigmatizing and false record that damaged Plaintiff's reputation.

c. Pretext (Title VII, 42 U.S.C. § 2000e-2): Defendant substituted conclusory labels for facts, using "unprofessionalism" as a cover to justify adverse action without evidentiary basis.

d. Due Process Violation (14th Amendment, U.S. Const. § 1983): Plaintiff was never notified of the accusation, never given an opportunity to respond, and never afforded a fair process to contest the charge.

158. "Parent concern" would have been neutral. "Unprofessionalism" was a conviction, placed in the subject line.


PRAYER FOR RELIEF

Plaintiff respectfully asks the Court to enter judgment in his favor and grant the following relief.

1. A declaration that Defendant's conduct violated Plaintiff's rights under the U.S. Constitution, Title VII of the Civil Rights Act of 1964, and the South Carolina Freedom of Information Act, S.C. Code Ann. § 30-4-10 et seq.

2. An order compelling immediate production of the complete SCHAC position-statement package and all associated materials, including the dated transmittal sheet, mediation or settlement election form, and the signed dated statement, as well as any drafts, attachments, metadata, and cover emails, and requiring Defendant to comply with FOIA deadlines and content requirements going forward.

3. An order requiring Defendant to remove and expunge from all personnel and investigatory files any false, post hoc, or defamatory material, including the August 23, 2021 "findings" memorandum, and any references derived from it, to restore any application records that were altered, suppressed, or deleted, and to provide Plaintiff a corrected written statement reflecting the true record.

4. A permanent injunction prohibiting Defendant, its agents, and anyone acting in concert with it from retaliating against Plaintiff for protected activity, from interfering with Plaintiff's access to records, to fair consideration for employment, or to the courts, and from misrepresenting, withholding, or altering records concerning Plaintiff.


5. An order requiring written FOIA protocols, tracking, and sign off by counsel or compliance for all responses, uniform hiring documentation practices, annual training for HR and administrators on anti-retaliation, due process, record integrity, and FOIA, and a posted non-retaliation notice district wide for at least 180 days.

6. Instatement into a suitable teaching position for which Plaintiff is qualified or, if instatement is impracticable, front pay in lieu of instatement, plus removal of any internal barriers that would impede neutral consideration.

7. Back pay, wages, benefits, and differentials with pre judgment interest, compensatory damages for emotional distress, reputational harm, and other non pecuniary losses to the extent permitted by Title VII and § 1983, and out of pocket losses including job search costs, medical and therapy expenses, travel, and related costs.

8. Punitive damages to the extent allowed by law and against any non immune defendants whose conduct was willful, malicious, or recklessly indifferent to Plaintiff's rights.

9. Reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 2000e-5(k), and any other applicable authority, together with post judgment interest.

10. Appropriate sanctions, including adverse inference instructions, for any destruction or alteration of relevant evidence.

11. A written neutral employment reference limited to dates of service, positions held, and last rate of pay, with no reference to disputed allegations.

12. Appointment of a limited term compliance monitor or periodic reporting to the Court for a defined period, and retention of jurisdiction to enforce the Court's orders.

13. Such other and further relief as the Court deems just and proper.

George Moses                    Dec 30, 2025
P.O. Box 7563
Columbia SC 29202